## Case No. 2,748.

### The CITY OF HARTFORD.

[4 Ben. 568.][1]

District Court, S. D. New York. Feb., 1871.[2]

COLLISION IN EAST RIVER — STEAMBOAT AND TUG CROSSING—WHISTLES.

1. A collision occurred in daylight in the East river, between a steamboat and a schooner, which, with another schooner, was in tow alongside of a tug, by which the schooner was sunk. The tow was bound up the East river, and the steamboat was bound down, and their courses were crossing, the tug having the steamboat on her starboard side. When the steamboat saw

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]
[2] [Modified in Case No. 2,752.]

the tug, she blew one whistle, and without waiting for a reply, ported her helm, and got a sheer to starboard, but this whistle was not heard on the tug. The tug then blew two whistles, and the steamboat replied to them by also blowing two whistles. Both vessels then starboarded. The tug, seeing that a collision was impending, stopped and reversed, which turned the head of the tow to starboard, and the steamboat, which had also stopped and reversed, struck the port bow of the schooner which was lashed on the port side of the tug. Both vessels were running much nearer the Brooklyn side of the river: *Held*, that, as the vessels were crossing, it was the duty of the steamboat to have kept her course.

2. As the tug had not heard the single whistle of the steamboat, she had the right to give the signal of two whistles, as she did, and was not then called on to stop. When the steamboat heard the two whistles of the tug, there was to her a confusion of signals, calling upon her at once to stop and reverse, unless she were certain that she could, by starboarding, avoid the tug. The tug, on hearing the two answering whistles from the steamboat, had the right to assume that a collision would be avoided by acting in accordance with them.

3. The stopping and backing of the tug was proper, and the steamboat was responsible for the effect which it produced on the tow, because a collision had then become inevitable, by reason of the previous action of the steamboat.

4. The tug was not in fault in not slowing and stopping sooner, but the steamboat was in fault in not slowing and stopping sooner.

5. The position of the vessels near the Brooklyn shore did not contribute to the collision.

6. The steamboat was responsible for the collision, and the tug was not in fault.

In admiralty. These were two libels filed by [Hudson S. Rideout and others and Charles Robinson, respectively] the owners of the schooner Alice S. Oakes and her cargo, against the City of Hartford and the Unit, to recover for the loss of the schooner and her cargo, by a collision with the City of Hartford, in the East river, on the morning of the 27th of March, 1869. The schooner was in tow of the Unit, lashed on her port side, another schooner being lashed on the starboard side of the tug, and was bound up the East river towards Hell Gate, while the steamboat was bound down the river to her berth. The facts sufficiently appear in the opinion of the court.

Joseph H. Choate and James C. Carter, for libellants.

Beebe, Donohue & Cooke, for the Unit.

R. H. Huntley, for the City of Hartford.

BLATCHFORD, District Judge. I have no difficulty, in this case, in holding that the City of Hartford was wholly in fault, and that the Unit was free from fault. When the City of Hartford first saw the Unit and her tows, she saw, or ought to have seen, that the Unit had the City of Hartford on the starboard side, and that, therefore, the Unit was bound to keep out of the way of the City of Hartford, and that the City of Hartford was bound to keep her course. Instead of obeying this rule of navigation, the City of Hart-

ford, on seeing the Unit and her tows, blew one whistle, and, without waiting for a reply, ported her helm, and got a sheer to starboard. It does not appear that this whistle was heard on board of the Unit. The Unit, seeing that she had the City of Hartford on her starboard side, and that their courses were crossing, so as to involve risk of collision, and that it was the duty of the Unit to keep out of the way, blew a signal of two whistles, indicating that she intended to starboard, and pass to the left. She had a right to give this signal. She had heard no signal from the City of Hartford, and could not see that the City of Hartford was porting. There was, to the Unit, no confusion of signals, calling upon her to stop. The City of Hartford heard the signal of two whistles from the Unit, and replied to it by a signal of two whistles, indicating her assent, not only that the Unit and the City of Hartford should both of them starboard, but that there was time and room for the City of Hartford, by their starboarding, to pass safely between the Unit and her tows and the Brooklyn shore. As the City of Hartford had blown one whistle and been answered by a signal of two whistles, there was then to her a confusion of signals, because of which she should have instantly stopped and reversed, unless she were certain she could, by starboarding, avoid a collision. The Unit had on her port hand, when she blew her signal of two whistles, a wide space of river. The City of Hartford had then on her port hand a narrow space of river. If, on receiving that signal, the City of Hartford was not certain that she would, by complying with it, go clear, she should have refused to respond to it by a signal of two whistles, and have responded by some signal showing confusion of signals or danger. Then she would have imposed on the Unit the necessity of desisting from her starboarding, and the further necessity of instantly stopping and reversing. As it was, the City of Hartford understood that the Unit was starboarding, directed the Unit to keep on starboarding, and announced that she herself would starboard, and that she had room and time to starboard and go clear, if the Unit should keep on starboarding. But, whatever starboarding there was on the part of the City of Hartford was ineffectual, either from the sheer to starboard she had previously got by porting, or from the effect of the flood tide on her port bow, or some other cause. The Unit proceeded with her tows, keeping her starboard helm, until she saw that the City of Hartford was likely to collide with her, or with one or the other of her tows, and then she stopped and reversed. The effect of this was to turn her head, and the heads of her tows towards the Brooklyn shore, so that the City of Hartford struck the port bow of the schooner on her port side. But the City of Hartford must be held responsible for this effect. The stopping and reversing was proper. It was certain that the City of Hartford would strike some one

of the vessels. Besides the effect mentioned, another effect was produced by the stopping and reversing of the Unit, and that was, that she got sternway through the water, and lessened the force of the blow, and, perhaps, confined the damage to the sinking of one vessel, instead of the sinking of three. The City of Hartford had no right to maintain so high and dangerous a rate of speed up to so near a point to the Unit and her tows, and, even if the stopping and reversing by the Unit, at the time, were not the most proper manoeuvre, it was one forced upon her, in the jaws of peril, by the fault of the City of Hartford.

Nor do I see that the Unit was in fault in not slowing or stopping and reversing sooner. Receiving the answering signal of two whistles from the City of Hartford, and having a clear space to pass to her own left, she had a right to suppose that the City of Hartford would starboard, and could starboard effectually, and she also had a right to keep on until the necessity arose for her slowing, stopping and reversing. She did stop and reverse as soon as that necessity arose.

The City of Hartford was in gross fault, irrespective of any other question in the case, in not slowing sooner than she did, and in not stopping and reversing sooner than she did. I do not think that the fact that both vessels were running much nearer to the Brooklyn piers than to the New York piers, can, in this case be taken into account, so as to charge either of them with fault in that respect. Their positions in that regard did not contribute to the collision, for each vessel saw the other in abundant season for the collision to have been avoided by proper manoeuvres thereafter.

There must be a decree in each case against the City of Hartford, with costs to the libellants, and a reference to a commissioner to ascertain the damages. The libel in each case must be dismissed, as to the Unit, with costs.

[NOTE. From this decree an appeal was taken to the circuit court, which modified the decree herein, entered a decree against both steamboat and tug, and ordered a division of the damages. See Cases Nos. 2,752, 2,753.]

[For a synopsis of the opinion of the supreme court, rendered on a decision affirming the circuit court decree in part and reversing it in part, see Case No. 2,753.]